**SUBMISSION OF INTERROGATORIES ON HOUSE BILL 99–1325**

No. 99SA108

Supreme Court of Colorado, En Banc.

April 23, 1999

As Modified on Denial of Rehearing May 17, 1999.

Office of Legislative Legal Services, Douglas G. Brown, Rebecca C. Lennahan, Sharon L. Eubanks, Denver, Colorado, Attorneys for the Colorado General Assembly

Berenbaum, Weinshienk & Eason, P.C., M. Frances Cetrulo, Eugene M. Sprague, Diana L. Powell, Edwin G. Perlmutter, Denver, Colorado, Attorneys for Michael F. Feeley, Stan Matsunaka, Bill Thiebaut, and Ed Perlmutter

Douglas Bruce, Pro Se, Colorado Springs, Colorado

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Christine M. Arguello, Deputy Attorney General, Harry S. Morrow, First Assistant Attorney General, Denver, Colorado, Troy A. Eid, Chief Counsel to the Governor, Heather M. Witwer, Deputy Counsel to the Governor, Denver, Colorado, Kutak Rock, Michael R. Johnson, John P. Jones, Craig N. Johnson, Thomas C. Weihe, Denver, Colorado, Attorneys for the Governor and the Colorado Department of Transportation

Chief Justice MULLARKEY delivered the Opinion of the Court.

This matter comes before us pursuant to article VI, section 3 of the Colorado Constitution. Under authority of that provision, the General Assembly of the State of Colorado, by joint resolution, submitted to this court three interrogatories regarding House Bill 99–1325. These are:

*Interrogatory No. One*

Would transportation revenue anticipation notes issued in accordance with the provisions of House Bill 99–1325 constitute a "debt by loan in any form" that is prohibited by section 3 of article XI of the state constitution?

*Interrogatory No. Two*

Would transportation revenue anticipation notes issued in accordance with the provisions of House Bill 99–1325 constitute a "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" that requires prior voter approval under section 20(4)(b) of article X of the state constitution?

*Interrogatory No. Three*

Would the proceeds from the issuance of transportation revenue anticipation notes issued in accordance with the provisions of House Bill 99–1325 be subject to the constitutional limitation on state fiscal year spending imposed by section 20(7)(a) of article X of the state constitution?

House Bill 99–1325 is attached as Appendix A. By order dated March 25, 1999, we accepted the interrogatories. We did so because the proposed legislation involved novel questions of constitutional law that are not clearly resolved by our existing cases. As drafted, the bill represents a good faith effort by the general assembly to comply with the constitution in light of the limited direction given by the cases.

We answer the first interrogatory in the negative. However, after careful analysis, we answer the second interrogatory in the affirmative. We conclude that the revenue anticipation notes (RANs) issued in accordance with House Bill 99–1325 are multiple-fiscal year financial obligations because the state is receiving money in the form of a loan and the state is pledging its credit over more than one year. We conclude that the voters, in adopting article X, section 20 (Amendment 1) would reasonably have expected that a borrowing of this magnitude be submitted to them for their approval. Therefore, we find that the RANs require voter approval under article X, section 20(4)(b) of the Colorado State Constitution. Since voter approval is required, if the RANs are approved by the voters, neither the debt service nor the proceeds would be subject to the constitutional limitation on state fiscal year spending imposed by article X, section 20(7)(a). Therefore, we answer interrogatory number three in the negative.

## I.

House Bill 99–1325 authorizes the Executive Director of the Department of Transportation to cause the state to issue revenue anticipation notes (RANs) in order to finance transportation projects that qualify for federal aid. *See* H.B. 99–1325, 62d Gen. Assembly, 1st Reg. Sess. (Colo.1999). Pursuant to the Transportation Equity Act for the 21st Century, *see* Pub.L. No. 105–178, sec. 1, No. 6 U.S.C.C.A.N. (112 Stat. 107) (Aug.1998), the federal government guarantees that 90.5% of payments made into the Federal Highway Trust Fund attributable to highway users in a particular state for the years 1998 through 2003, shall be allocated to that state as available federal highway aid. *See* 23 U.S.C. § 105(f), *as amended by* Act of June 9, 1998, 23 U.S.C.S. § 105(f) (Lexis Supp. Jan. 1999). Colorado's share is estimated to be $300 million annually until the year 2003. *See* Pub.L. No. 105–178, sec. 1102, No. 6 U.S.C.C.A.N. (112 Stat. 115) (Aug.1998); 23 U.S.C. § 105(b), *as amended by* Act of June 9, 1998, 23 U.S.C.S. § 105(b) (Lexis Supp. Jan. 1999). As a condition to receiving this federal highway aid, all states are to pay ten to twenty percent of the project cost, de-

pending upon the type of project. *See* 23 U.S.C.A. § 120(a), (b) (West Supp.1998).

Instead of timing the State's highway construction projects to await the arrival of federal aid, House Bill 99–1325 seeks to complete those projects at an earlier date by raising the capital through RANs that pledge the receipt of the federal funds. The general assembly believes that by completing the projects at present-day costs and without the delays caused by a "pay-as-you-go" system, the State will be able to reduce the cost of construction. *See* Colo. H.B. 99–1325, § 43–4–701(f).

Such an advance of funds also takes advantage of a change in the use of federal highway grants made by the National Highway System Designation Act of 1995. *See* Pub.L. No. 104–59, § 1, 109 Stat. 568 (1995); 23 U.S.C.A. § 122 (West Supp.1998). Prior to this amendment, the federal government required that states limit their use of federal grants to paying only the principal portion of debt issued for highway projects. *See* 23 U.S.C. § 122 (1994). Now, federal funds can be used to pay the interest, insurance, and issuance costs associated with any debt financing instrument deemed eligible by the federal government. *See* 23 U.S.C.A. § 122(b). Since interest payments are the primary component of the early stages of debt service, the new rule makes bond issues less expensive for the states.

In response, states have developed innovative financing devices that take advantage of the changes in the federal highway aid programs. These financing devices have been coined Grant Anticipation Revenue Vehicles or GARVEEs. House Bill 99–1325 represents Colorado's formulation of GARVEEs through the RAN instrument in light of Colorado caselaw construing the state's constitutional prohibition against public debt, *see* Colo. Const. art. XI, § 3, and our limited caselaw construing the requirement of Amendment 1 that voters approve any multiple-year fiscal direct or indirect debt or other financial obligation whatsoever, *see* Colo. Const. art. X, § 20(4)(b).

Attached in Appendix B is the State and Local Conditional Fiscal Impact statement

(Draft Fiscal Impact Statement) issued on February 24, 1999, by the Colorado Legislative Council Staff regarding House Bill 99–1325. According to this document, if the State wants to generate $1.0 billion in funds for construction costs occurring over a period of fifteen years, the transportation commission would be required to issue approximately $1,114,460,000 in RANs. Under this formulation, the State seeks to obtain a Moody's rating of Aa.

Pursuant to House Bill 99–1325, these notes and their associated costs would be repaid from federal transportation funds, state matching funds, pledged RAN proceeds and their investment earnings, and any other revenues, funds, or other security pledged for the payment of the RANs that do not constitute revenue or funds of the State. *See* Colo. H.B. 99–1325, § 43–4–704(2)(a)(I)–(III). If the federal share of the notes cannot be repaid when due because the federal funds are insufficient, House Bill 99–1325 authorizes the federal share to be paid temporarily from state matching funds.[1] *See id.* § 43–4–704(2)(c)(I)(B). If the transportation commission determines that subsequent federal funds are not needed in the future to pay the federal share of the principal, interest, and costs, House Bill 99–1325 provides that the state matching funds shall be reimbursed. *See id.* § 43–4–704(2)(c). When the federal funds are received, the state matching funds would be reimbursed from the federal funds.[2] *See id.* State funds that are constitutionally earmarked for state highway purposes, under article X, section 18, will not be used to pay RANs financing a qualified federal aid transportation project if that project is not a state highway project. *See id.* § 43–4–704(2)(d).

The funds and any additional money needed to pay for the related costs of the RANs are subject to annual allocation by the transportation commission. *See id.* § 43–4–704(2)(a)(I); § 43–1–113, 11 C.R.S. (1998). The amount of funds allocated for a series of RANs is limited to fifty percent of the federal funds paid to the transportation commission during the year immediately preceding the fiscal year in which that series is issued. *See* Colo. H.B. 99–1325, § 43–4–704(4)(b). The bill states that the owners or holders of the RANs may not look to any other state revenues for payment, *see id.* § 43–4–704(2)(b), and it states that if the transportation commission does not allocate RAN proceeds, state matching funds, or federal funds for the payment of the RANs or their associated costs in any given year, such a decision will not constitute an action impairing the RAN contract. *See id.* § 43–4–705(1).

Any contract entered into pursuant to House Bill 99–1325 would be required to provide that all financial obligations of the State under such contract are subject to annual allocation by the transportation commission in its discretion. *See id.* § 43–4–705(2)(a). In addition, the contract must provide that it could not be construed as creating state debt within the meaning of the Colorado Constitution or Colorado state law and that it cannot be construed as a multiple-fiscal year direct or indirect financial obligation within the meaning of article X, section 20 of the Colorado Constitution. *See id.* § 43–4–705(2)(a)(I), (II). The RANs and any contract relating to the issuance of such notes would further provide that payment by the State of the federal funds portion of the RANs is subject to continuing federal appropriation. *See id.* § 43–4–705(2)(b). However, the executive director of the transportation commission may provide security in the form of letters of credit, bond insurance,

---

1. The bill provides that "state matching funds" are those revenues that are credited to the state highway fund or state highway supplementary fund pursuant to section 43–1–220, 11 C.R.S. (1998). *See* Colo. H.B. 99–1325, § 43–4–702(8). Federal funds are excluded. *See id.*

2. Section 43–1–220(2)(c) states that federal funds are paid and credited to the state highway *supplementary* fund. (Emphasis added). House Bill 99–1325 provides that both the state highway fund and the state highway supplementary fund may be reimbursed for state funds that pay the federal share, notwithstanding section 43–1–220(2)(c)'s mandate that these funds be credited to the supplementary fund. *See* Colo. H.B. 99–1325, § 43–4–704(2)(c)(II). In this section of House Bill 99–1325, a reference is made to subsection (2)(h) of section 43–1–220. *See id.* This subsection is not located within section 43–1–220, so the meaning of this reference is unclear.

stand-by credit agreements, or other forms of credit. *See id.* § 43–4–704(3)(b).

## II.

■ Pursuant to article VI, section 3 of the Colorado Constitution, this court has original jurisdiction over "important questions upon solemn occasions when required by the governor, the senate, or the house of representatives. . . ." In order for this court to provide answers to these questions, the questions must be connected with pending legislation and must concern either the constitutionality of the legislation or matters connected to the constitutionality of the legislation concerning purely public rights. *See Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d 1, 3 (Colo.1993) (citing *In re Interrogatories of the House,* 62 Colo. 188, 189–90, 162 P. 1144, 1144 (1917)).

The Colorado House of Representatives passed House Bill 99–1325 on March 9, 1999. The second reading of the bill passed the Senate on March 22, 1999. When the interrogatories were submitted, the bill awaited final action by the Senate. Therefore, House Bill 99–1325 then was pending legislation.

On March 25, 1999, we exercised our original jurisdiction after determining that the interrogatories are sufficiently important and proper. We solicited simultaneous opening and answer briefs from the General Assembly, the Governor, the Attorney General, and any other interested parties. In this opinion, we will refer to the General Assembly, the Governor, and the Attorney General as the proponents. We will refer to the interested parties as the taxpayers.

■ The interrogatories pose questions relating to two provisions of the Colorado Constitution: article XI, section 3 and article X, section 20. As a general rule of constitutional construction, we presume statutes are constitutional. *See People v. Martinez,* 970 P.2d 469, 473 (Colo.1998). However, this presumption is not applicable to interrogatories presented under article VI, section 3,

because the bill in question has not been passed and the legislature has certified to us that they are not certain of its constitutionality.[3] *See In re Senate Resolution No. 2 Concerning Constitutionality of House Bill No. 6,* 94 Colo. 101, 112, 31 P.2d 325, 329–30 (1933). Thus, we must dispense with this presumption with regard to House Bill 99–1325. When interpreting the language of article XI, section 3 and article X, section 20 in light of these interrogatories, we follow the general rule of constitutional construction that the language of our constitution, so far as possible, must be given its ordinary meaning, and the words thereof their common interpretation. *See id.* at 113, 31 P.2d at 330. However, if the language contained in a citizen-initiated measure, like article X, section 20, is ambiguous, a court may ascertain the intent of the voters by considering other relevant materials such as the ballot title and submission clause and the biennial "Bluebook," which is the analysis of ballot proposals prepared by the legislature. *See Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo. 1996).

## III.

### A.

■ The first interrogatory concerns whether the transportation RANs would constitute a "debt by loan in any form" that is prohibited by article XI, section 3 of the Colorado Constitution. That provision states in relevant part that "[t]he state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue [or] erect public buildings for the use of the state." *See* Colo. Const. art. XI, § 3. The purpose of this provision is to prevent the pledging of state revenue for future years or the creation of obligations that would require future revenues from a tax otherwise available for general purposes. *See In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005,* 814 P.2d 875, 889 (Colo.1991). Some of the characteristics of debt prohibited by article XI, section

---

**3.** For the purposes of answering these interrogatories, the only information we have for our review is the text of House Bill 99–1325 and the Draft Fiscal Impact Statement. We are unable to review the legislation as applied. Therefore, we answer the interrogatories in light of how it appears that the bill is likely to be applied.

3 are: (1) obligations that pledge revenues of future years, (2) obligations that require the use of revenue from a tax otherwise available for general purposes, (3) obligations legally enforceable against the state in future years, or (4) obligations for which future legislatures do not have the discretion to appropriate funds. *See Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878–79 (Colo.1983). If an appropriation is .purely discretionary and nonobligatory, it is not a payment on a constitutional debt. *See In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S–1005,* 814 P.2d at 889.[4]

Financing devices that have been previously approved are: (a) when borrowed funds are repaid from the revenue generated by the improvement (special fund cases), (b) when the entity borrowing the money is a public entity independent from the state, and (c) when the state enters into a lease-purchase agreement for a building or other improvement, and the parties are not bound to renew the lease at the end of the year. *See id.*

The RANs at issue do not fit clearly within any of these financing devices. Nevertheless, the proponents assert that the RANs should be treated like the lease-purchase agreement we approved in *Glennon Heights. See* 658 P.2d at 879. The taxpayers distinguish these notes from the lease-purchase agreement in *Glennon Heights* because in that case, the lease terminated at the end of the year if not renewed. In contrast, the taxpayers assert that the RANs authorized by House Bill 99–1325 violate article XI, section 3 because the RANs constitute a contract between the transportation commission and the noteholder that remains in effect even if the State does not make payment in a particular year.

The proponents assert that the debt characteristics set out in *Glennon Heights* are applicable. They claim that under *Glennon Heights,* House Bill 99–1325 does not violate article XI, section 3 because (1) federal transportation funds and state matching

funds are pledged annually when allocated each year by the transportation commission, so they do not pledge revenue of future years, (2) federal transportation funds and state matching funds are already dedicated for transportation purposes, so the bill does not require the use of revenues from state taxes that are otherwise available for general state purposes, (3) if the transportation commission does not make an annual appropriation, the owners of the RANs may only look to the RAN proceeds or nonstate revenues that have been pledged for the payment of the RANs, not other state revenues, and (4) the revenues required to pay the RANs are subject to annual allocation by the transportation commission at its discretion.

In *Glennon Heights,* the State, through the Department of Institutions, entered into a lease-purchase agreement for two group homes that were being constructed by the State on property owned by the Central Bank & Trust (Bank). *See Glennon Heights,* 658 P.2d at 874. Pursuant to the lease-purchase agreement, the State leased the property for the term of one year with seventeen consecutive annual renewal terms. *See id.* A new term would commence when the General Assembly appropriated to the Department of Institutions funds for the annual rental payments. *See id.* In response to a challenge asserting that the lease-purchase agreement violated article XI, section 3, we held that such an agreement did not constitute debt in any form. *See id.* at 878–79. We reached this conclusion because the Bank had no legally enforceable right to require that the General Assembly appropriate funds for the renewal of the lease term or to require that the General Assembly exercise its option to renew the lease. *See id.*

■ We agree that, applying the debt analysis of *Glennon Heights,* House Bill 99–1325 does not violate article XI, section 3. First, it does not pledge state revenues for future years because the funds are subject to annual allocation by the transportation commission. In addition, repayment of the RANs does not require the use of revenue

4. Bonds that do not legally bind a legislature beyond a session but that create a moral obligation to appropriate money are referred to as "moral obligation bonds." *See In re Oklahoma Capitol Improvement Auth.,* 958 P.2d 759, 768 n. 39 (Okla.1998).

from a tax otherwise available for general purposes. The federal funds are only available to reimburse the State for projects deemed eligible under the National Highway System Designation Act of 1995. *See* 23 U.S.C.A. § 122. The state matching funds are paid to the transportation commission under a continuing, annual appropriation and so do not use revenue from a tax otherwise available for general purposes.

House Bill 99–1325 does not demonstrate the third characteristic of debt that violates article XI, section 3 because the note holders may not look to other state revenues for payment and, thus, a claim for payment is not legally enforceable against the State. The bill also does not demonstrate the fourth characteristic because payment of the RANs is subject to annual appropriation, which does not bind future legislatures. Therefore, we find that the transportation RANs do not constitute a debt by loan in any form that is prohibited by article XI, section 3. As a result, we answer interrogatory number one in the negative.

### B.

The second interrogatory concerns whether the transportation RANs would constitute a "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" that requires prior voter approval under article X, section 20(4)(b) of the state constitution.

Article X, section 20 (Amendment 1) is an initiated constitutional amendment that was approved by the voters in 1992. *See Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d at 4. Amendment 1 circumscribes the revenue, spending, and debt powers of state and local governments by requiring voter approval for certain state and local tax increases and by restricting property, income, and other taxes. *See id.; Havens v. Board of County Comm'rs,* 924 P.2d 517, 519 (Colo.1996); *City of Wheat Ridge v. Cerveny,* 913 P.2d 1110, 1115 (Colo.1996).

Article X, section 20(4) of the Colorado Constitution states in relevant part:

(4) Required elections. Starting November 4, 1992, districts must have voter approval in advance for:

. . . .

(b) ... creation of any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years.

Colo. Const. art. X, § 20(4)(b).

The terms used in the phrase "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever," were not defined by Amendment 1. However, the court of appeals set out a definition in *Board of County Commissioners v. Dougherty, Dawkins, Strand & Bigelow, Inc.,* 890 P.2d 199, 206–07 (Colo.App.1994). In *Dougherty,* the court of appeals held that the phrase "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" in Amendment 1 is no broader than the phrase "debt by loan in any form" as defined by article XI, section 6 of the Colorado Constitution. *See id.* at 207.[5] The proponents urge us to adopt the *Dougherty* court's equation of these two constitutional phrases. We decline to do so.

It is our duty to give effect, whenever possible, to the will of the people as expressed in voter approved constitutional amendments. *See Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d at 6. The two constitutional provisions at issue here serve different purposes. Article XI, section 3 prohibits true debt in order to protect the state treasury. Amendment 1 is not a prohibition, but rather establishes procedures that must be followed if the State is to assume certain financial obligations. As we stated in *Nicholl v. E–470 Public Highway Authority,* 896 P.2d 859 (Colo.1995), "The restrictions imposed by section (4)(b) [of Amendment 1] apply to direct and indirect debt and any 'other financial obligation whatsoever' without distinction among the possible methods of securing and repaying that debt." *E–470,* 896 P.2d at 870. Since

---

5. Article XI, section 6 is similar to article XI, section 3 except that the limitations of section 6 apply to local government debt rather than the public debt of the State. *See City of Trinidad v. Haxby,* 136 Colo. 168, 174, 315 P.2d 204, 207 (1957).

article X, section 20(1) suspends the tax and spending approval requirements only "[w]hen annual district revenue is less than annual payments on general obligation bonds, pensions, and final court judgments," Colo. Const. art. X, § 20(1), we held in *E–470* that "other financial obligation whatsoever" includes obligations not commonly treated as debt. *See E–470*, 896 P.2d at 870. It follows from this conclusion that the phrase "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" in Amendment 1 is necessarily broader than the phrase "debt by loan in any form" as defined by article XI, section 6 and, for our purposes, article XI, section 3 of the Colorado Constitution. Therefore, to the extent that *Dougherty* held that the two phrases are synonymous, it is overruled.

■ However, the scope of this phrase cannot be without bounds. In 1992, when Amendment 1 was presented to the voters, they were informed in the biennial "Bluebook" that section 4(b) of that amendment would "require voter approval for the creation of most financial obligations that extend beyond the current fiscal year" unless the government sets aside the money in advance. *See* Legislative Council of the Colo. Gen. Assembly, *An Analysis of 1992 Ballot Proposals* 7 (1992). Read literally, this provision could encompass many financial obligations that would include something other than borrowing money. An example is when a local government enters into a multiple year lease-purchase agreement for equipment, like copy machines or computers. If Amendment 1 did include such a situation, then a local government could not enter into the agreement unless it first obtained voter approval. This could lead to absurd results because not only would it cripple the everyday workings of government, but also, in some cases, the cost of the election could exceed the cost of the item purchased under the agreement. The voters could not have intended such a result when they approved Amendment 1.

The lease-purchase agreement approved in *Dougherty* provides an example of one such situation. In *Dougherty*, the County of Boulder (County), without an election, entered into a lease-purchase agreement in which a bank bought a road grader and leased it to the County for an initial term of eight months with four additional one-year renewal terms. At the end of the final term, the County could purchase the road grader at no additional cost. *See Dougherty*, 890 P.2d at 201. The County did not have to pay for the use of the equipment until the year in which it was utilized.

If one analyzes the nature of the obligation in *Dougherty*, the interests represented by the contract, and the parties' resulting relationship, it is apparent that the lease-purchase agreement was not a financial obligation requiring voter approval because it did not entail the borrowing of funds or pledge the credit of the State. The agreement required that the bank provide a road grader in exchange for the County's promise to pay a certain sum of money to cover the County's use of the grader for eight months. The County had no obligation to pay beyond each individual term of the lease unless the County decided to extend the lease by appropriating the necessary funds. As such, the County did not pledge its credit to enter into the lease. In addition, the County did not enter into long-term debt because it did not incur an obligation that extended beyond one year. Although the County likely intended to lease the road grader all five terms and intended to exercise the purchase option, it was not required to do either. If the County did not appropriate the funds necessary to extend the lease, the bank could repossess the road grader. The lease-purchase agreement neither pledged the credit of the State nor required the borrowing of funds. As such, it should be outside the scope of Amendment 1.

In contrast, the RANs authorized under House Bill 99–1325 present a different situation in that it is evident that the State is receiving money in the form of a loan from investors. In its simplest form, the agreement provides that the State receive funds in exchange for the sale of notes. Investors buy the notes expecting a fair rate of return on the use of their money. The bill itself, by stating that the RANs are negotiable instruments, implies that the RANs contain an unconditional promise of payment. *See* Colo. H.B. 99–1325, § 43–4–704(9); § 4–3–104(a), 2 C.R.S. (1998) (defining a negotiable instrument as an unconditional promise or order to pay). In addition, the Draft Fiscal Impact

Statement suggests that the RANs will be issued for a period of fifteen years.

Although a loan is not proscribed by Amendment 1, such a financial relationship comes within the scope of "other financial obligation whatsoever" and, thus, activates the election requirement of the amendment if the financial relationship extends beyond one year. *See* Colo. Const. art X, sec. 20(4)(b). In an attempt to make certain that the financial obligation in House Bill 99–1325 fell outside Amendment 1, the general assembly relied on our decision in *Nicholl v. E–470 Public Highway Authority*, 896 P.2d 859 (Colo.1995). In *E–470*, we held that when an obligation is likely to extend beyond one year, it is a multiple-year fiscal obligation as defined by article X, section 20(4)(b). *See id.* at 871. The proponents of House Bill 99–1325 assert that since the transportation commission does not have a legal duty to allocate money beyond the first year, there is no multiple-fiscal year obligation. However, our decision in *E–470* should not be read so narrowly as to mean that if payment is discretionary beyond the first year, then a financial obligation is not within Amendment 1. Rather, the entire obligation must be looked at as a whole.

When House Bill 99–1325 is interpreted as a whole, it is apparent that the payment obligations are likely to extend into multiple years because the State must make a pledge of its credit for the notes to be marketable. That the State intends to pledge its credit is evident from the bill itself. To effectuate such a sale, the executive director of the transportation commission may provide security in the form of letters of credit, bond insurance, stand-by credit agreements, or other forms of credit. *See* Colo. H.B. 99–1325, § 43–4–704(3)(b). The executive director may be required to provide such security in order to sell the RANs because

the federal funds pledged for repayment are only guaranteed until the year 2003. To achieve a Moody's rating of Aa, which increases the market for the RANs, a state would have to pledge more than just its future federal revenues. *See Federal Highway Aid Grant Anticipation Financing*, Moody's Inv. Serv., Nov. 1998, at 3; *see also* Annmarie Hauck Walsh, *The Public Business: The Politics and Practices of Government Corporations* 79 (1978) (noting that bond insurance that backs up the payment of principal and interest can provide the issuer with a double-A rating). Looking to the economic realities and circumstances of the transactions by which the RANS are to be sold, we note the potential application of our state securities laws.[6] The certificate, trust indenture or other instrument authorizing the issuance of RANs may pledge the proceeds from the issuance of the RANs as security. *See* Colo. H.B. 99–1325, § 43–4–706(1). Such a pledge creates a valid, self-executing security interest in the proceeds. *See id.* § 43–4–704(12)(a). There is no language in the bill implying that the security interest would expire at the end of a year. Rather, the existence of the security interest and the fact that such a security interest enhances the marketability of the RANs support the conclusion that the obligation created by the RANs is likely to extend beyond one year.

As we discussed earlier, when Amendment 1 was presented to the voters, they were told that it would "require voter approval for the creation of most financial obligations that extend beyond the current fiscal year unless government sets aside enough money to fund the obligation in all years that payments are due." *An Analysis of 1992 Ballot Proposals, supra*, at 7. Here, the department of transportation budget is nearly $585 million for construction, mainte-

---

**6.** Our conclusion that the RANs are multiple-fiscal year *financial* obligations may find support in the Colorado Securities Act, *see* §§ 11–51–101 to 11–51–908, 3 C.R.S. (1998), and our treatment of investment notes as a "security." *See People v. Milne*, 690 P.2d 829, 833 (Colo.1984). In *Milne*, we held where "noteholders entrusted money ... in return for 'investment notes,' with the expectation of receiving periodic interest payments in addition to repayment of the principal amount" that such notes fall "squarely within the

language of" our statute defining a security. *Id.* at 833 (referring to section 11–51–102(12), 4 C.R.S. (1973), now codified at section 11–51–102(17), 3 C.R.S. (1998)); *see also Reves v. Ernst & Young*, 494 U.S. 56, 63–65, 65 n. 3, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (holding under federal securities laws that there is a rebuttable presumption that a note is a "security"); *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (2d Cir.1976) (discussing notes that are not securities).

nance, and operations in the fiscal year ending June 30, 1999. *See* ch. 336, sec. 1, 1998 Colo. Sess. Laws 1803, 2091. The issuance of $1.0 billion in RANs is substantial in comparison to the size of that budget. It is therefore reasonable for the voters to have expected that notes issued for such a borrowing would be submitted to them for their consideration.

As a result, we hold that the transportation revenue anticipation notes issued in accordance with the provisions of House Bill 99–1325 constitute a "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" that requires voter approval under article X, section 20(4)(b). Therefore, we answer interrogatory number two in the affirmative.

### C.

■ The third interrogatory concerns whether the proceeds from the RANs would be subject to the constitutional limitation on state fiscal year spending imposed by section 20(7)(a) of article X of the state constitution. That provision limits the annual growth in state fiscal year spending.[7] Article X, section 20(7) mandates that revenue not excluded from fiscal year spending limits be refunded to taxpayers unless voters approve a revenue change as an offset. *See* Colo. Const. art X, § 20(7)(d).

■ The General Assembly argues that article X, section 20(7)(a) is ambiguous concerning whether RANs should be included in state fiscal year spending. We do not need to address whether section 20(7)(a) is ambiguous because we have determined that the RANs are subject to the prior voter approval requirements of Amendment 1. Under section 20(7)(a), the calculation of "maximum annual percentage change in state fiscal year spending" is "adjusted for revenue changes approved by [the] voters." *See* Colo. Const. art X, § 20(7)(a). Additionally, voter approval of the RANs removes their debt service from the spending limit. *See E–470*, 896 P.2d at 872 n.17. As a result, if

approved by the voters, neither the principal or interest nor the proceeds from the RANs would be subject to the constitutional limitation on state fiscal year spending imposed by article X, section 20(7)(a). Therefore, we answer interrogatory number three in the negative.

### IV.

In conclusion, we hold that although the RANs are not a "debt by loan in any form" that is prohibited by article XI, section 3, the RANs are a "multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" requiring voter approval under article X, section 20(4)(b). Since voter approval is required, neither the debt service nor the RAN proceeds would be subject to the constitutional limitation on state fiscal year spending imposed by article X,section 20(7)(a), if voters approve the RANS. Therefore, we answer interrogatory number one and three in the negative and interrogatory number two in the affirmative.

### APPENDIX A

**First Regular Session**

**Sixty-second General Assembly**

LLS NO. 99–0735.01 Sharon Eubanks

HOUSE BILL 99–1325
**STATE OF COLORADO**

BY REPRESENTATIVE George;

also SENATOR Powers.
**REVISED**

**TRANSPORTATION & ENERGY**

A BILL FOR AN ACT
CONCERNING TRANSPORTATION

---

**7.** Article X, section 20(7)(a) of the Colorado Constitution states in relevant part: "The maximum annual percentage change in state fiscal year spending equals inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991." *See* Colo. Const. art. X, § 20(7)(a).

"Fiscal year spending" means all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards, or property sales. Colo. Const. art. X, § 20(2)(e).

## REVENUE ANTICIPATION NOTES.

### Bill Summary

*(Note: This summary applies to this bill as introduced and does not necessarily reflect any amendments that may be subsequently adopted.)*

Authorizes the executive director of the department of transportation to issue revenue anticipation notes ("RANs") in order to finance qualified federal aid transportation projects. Provides that the notes and the costs related thereto are payable from: State matching funds; federal funds paid to the department or political subdivisions of the state that can be used to finance such transportation projects; note proceeds and investment earnings on such note proceeds; and certain other nonstate revenues. If federal transportation funds are not sufficient to pay the federal share of principal of and interest on notes and associated costs when due, authorizes the temporary payment of such federal share with state matching finds that will be reimbursed from the federal transportation funds when received. Requires that state moneys constitutionally earmarked for highway purposes be used only to pay for the portion of notes issued for qualified federal aid transportation projects that are highway projects. Specifies that the moneys to be used to pay such notes and the related costs are subject to annual allocation by the transportation commission.

Sets forth a legislative declaration stating that:

- It is reasonable and necessary to use revenue anticipation notes to finance state transportation projects that may be financed in whole or in part with federal transportation funds;
- Transportation revenue anticipation notes contingent upon annual allocation by the transportation commission do not constitute "a debt by loan in any form" or "any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever" within the meaning of the state constitution;

- Transportation revenue anticipation note proceeds are not included in state fiscal year spending.

Imposes a limitation on the aggregate amount of annual installments of principal and interest on revenue anticipation notes that is due and payable during any given fiscal year based upon a percentage of federal transportation funds paid to the department in the previous fiscal year. Specifies certain procedures and requirements for the issuance of such notes, and authorizes the executive director of the department of transportation to make certain determinations regarding such notes. Requires that transportation revenue anticipation notes shall include certain terms, including the requirement that the payment obligations are subject to annual allocation by the transportation commission. Authorizes the executive director to refund such notes, to engage services required or advantageous in connection with such notes, and to enter into interest rate exchange agreements for such notes.

States that transportation revenue anticipation notes shall be paid from certain moneys and that the owners or holders of such notes may not look to any other state revenues for the payment of the notes. Authorizes the pledging of note proceeds for the payment of notes. Specifies that note proceeds not pledged for the payment of notes are credited to the state highway supplementary fund and shall be used for certain purposes. States that note proceeds are not included in state fiscal year spending. Provides that any note proceeds pledged for the payment of notes and the related costs and moneys allocated for the payment of notes and the related costs are pledged for such purpose, that such pledge is valid and binding, and that such moneys shall not be used for any other purpose.

Grants certain powers to political subdivisions of the state for the purpose of aiding and cooperating in the financing, construction, operation, and maintenance of qualified federal aid transportation projects. Requires the executive director to make annual reports to the general assembly regarding

transportation revenue anticipation notes and specifies information to be included in such reports.

Makes conforming amendments.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** Article 4 of title 43, Colorado Revised Statutes, is amended BY THE ADDITION OF A NEW PART to read:

PART 7

TRANSPORTATION REVENUE ANTICIPATION NOTES

**43–4701. Legislative declaration.** (1) THE GENERAL ASSEMBLY HEREBY FINDS AND DECLARES THAT:

(a) THE RAPID GROWTH OF THE ECONOMY OF THIS STATE HAS PROMPTED NEW AND EVER–INCREASING USES OF PUBLIC HIGHWAYS, ROADS, AND OTHER TRANSPORTATION INFRASTRUCTURE, AND THE EXISTING TRANSPORTATION INFRASTRUCTURE OF THIS STATE CANNOT ACCOMMODATE SUCH GREATLY INCREASED USES;

(b) ONE OF THE MAJOR CONCERNS OF THE CITIZENS OF THIS STATE IS THE ABILITY OF THE STATE AND LOCAL GOVERNMENTS TO ADDRESS THE LONG–TERM TRANSPORTATION INFRASTRUCTURE NEEDS OF THIS STATE THAT ARE CRITICAL TO THE CONTINUED GROWTH OF THE STATE'S ECONOMY AND THE MAINTENANCE OF CITIZENS' QUALITY OF LIFE;

(c) IN AN ATTEMPT TO ADDRESS THIS CONCERN, THE STATE HAS SIGNIFICANTLY INCREASED THE AMOUNT OF STATE REVENUES AVAILABLE IN RECENT YEARS TO FUND CRITICAL, PRIORITY TRANSPORTATION INFRASTRUCTURE NEEDS, BUT CURRENT TRANSPORTATION FUNDING MECHANISMS DO NOT PROVIDE ADEQUATE REVENUES TO KEEP PACE WITH THE INCREASING DEMANDS ON TRANSPORTATION INFRASTRUCTURE STATEWIDE;

(d) BY UTILIZING REVENUE ANTICIPATION NOTES FOR THE FINANCING OF TRANSPORTATION PROJECTS THAT MAY BE FINANCED, IN WHOLE OR IN PART, WITH FEDERAL TRANSPORTATION FUNDS, A SIGNIFICANT AMOUNT OF UP–FRONT REVENUES CAN BE GENERATED FOR SUCH FEDERAL AID TRANSPORTATION PROJECTS WHICH WILL ENABLE THE STATE TO DESIGN AND CONSTRUCT SUCH TRANSPORTATION PROJECTS WITHOUT USING REVENUES AVAILABLE FOR OTHER IMPORTANT TRANSPORTATION PROJECTS;

(e) THE UNITED STATES CONGRESS RECENTLY AUTHORIZED A SPECIFIC AMOUNT OF FEDERAL FUNDS TO BE AVAILABLE FOR FEDERAL AID TRANSPORTATION PROJECTS INVOLVING TRANSIT, A PORTION OF WHICH HAS NOT YET BEEN AWARDED FOR SPECIFIC PROJECTS, AND THE STATE MUST ENTER INTO AN AGREEMENT WITH THE FEDERAL GOVERNMENT AS SOON AS POSSIBLE IF IT IS TO BE ELIGIBLE TO RECEIVE ANY OF THESE FEDERAL FUNDS;

(f) UTILIZING REVENUE ANTICIPATION NOTES TO FINANCE FEDERAL AID TRANSPORTATION PROJECTS ALSO RESULTS IN SIGNIFICANT COST SAVINGS TO THE STATE, SINCE SUCH TRANSPORTATION PROJECTS CAN BE COMPLETED AT PRESENT–DAY COSTS AND AT AN ACCELERATED PACE, BUT THE STATE NEEDS TO BE ABLE TO ACT QUICKLY TO ISSUE REVENUE ANTICIPATION NOTES IN ORDER TO REALIZE THESE COST SAVINGS; AND

(g) IT IS REASONABLE AND NECESSARY TO UTILIZE REVENUE ANTICIPATION NOTES FOR THE FINANCING OF FEDERAL AID TRANSPORTATION PROJECTS.

(2) THE GENERAL ASSEMBLY FURTHER FINDS AND DECLARES THAT:

(a) THE CURRENT AND LONG–STANDING PROCESS OF FUNDING THE TRANSPORTATION INFRASTRUCTURE NEEDS OF THE STATE, WHICH INVOLVES THE CONTINUOUS APPROPRIATION OF CERTAIN STATE REVENUES TO THE DEPARTMENT OF TRANSPORTATION BY THE GENERAL ASSEMBLY AND THE ANNUAL ALLOCATION OF STATE AND FEDERAL FUNDS TO SPECIFIC PROJECTS AND PURPOSES BY THE TRANSPORTATION COMMISSION, IS INTENDED TO ENSURE THAT SUCH FUNDING DECISIONS ARE BASED ON ANNUAL DETERMINATIONS OF REVENUE AVAILABILITY AND TRANSPORTATION INFRASTRUCTURE NEEDS STATEWIDE;

(b) MAKING THE PAYMENT OF REVENUE ANTICIPATION NOTES ISSUED IN ACCORDANCE WITH THIS PART 7 SUBJECT TO ANNUAL ALLOCATION BY THE TRANSPORTATION COMMISSION IS EQUIVALENT TO MAKING SUCH PAYMENTS SUBJECT TO ANNUAL LEGISLATIVE APPROPRIATION, SINCE THE ANNUAL ALLOCATION PROCESS REQUIRES THE TRANSPORTATION COMMISSION TO MAKE THE SAME ANNUAL BUDGETING DECISIONS THAT THE GENERAL ASSEMBLY MAKES THROUGH THE APPROPRIATION PROCESS;

(c) Revenue anticipation notes issued in accordance with the provisions of this part 7 that evidence the right to receive payments in subsequent fiscal years contingent upon funds for such payments being allocated on an annual basis in the sole discretion of the transportation commission:

(I) Do not constitute "a debt by loan in any form" under section 3 of article XI of the state constitution based upon the Colorado supreme court's decision in *Glennon Heights Inc. v. Central Bank & Trust,* 658 P.2d 872 (Colo.1983), since the notes are not a legally enforceable obligation against the state in future years and the annual allocation of such funds for the payment of such notes is in the sole discretion of the transportation commission; and

(II) Do not constitute "any multiple-fiscal year direct or indirect debt or other financial obligation whatsoever" under section 20(4)(b) of article X of the state constitution based upon the Colorado court of appeals' decision in *Boulder v. Dougherty, Dawkins,* 890 P.2d 199 (Colo. App.1994), since the payments are subject to annual allocation by the transportation commission and the transportation commission is not required to allocate future revenues for the payment of such notes; and

(d) In accordance with the Colorado supreme court decision in *Nicholl v. E–470 Public Highway Authority,* 896 P.2d 859 (Colo.1995), the proceeds of any transportation revenue anticipation notes issued in accordance with this part 7 are not included in state fiscal year spending for purposes of section 20 of article X of the state constitution and article 77 of title 24, C.R.S.

**434–702. Definitions.** As used in this part 7, unless the context otherwise requires:

(1) "Commission" means the transportation commission created by section 43–1–106.

(2) "Department" means the department of transportation created by part 1 of this article.

(3) "Executive director" means the executive director of the department.

(4) "Federal transportation funds" means:

(a) Funds paid to the department by the United States department of transportation; and

(b) Funds paid to any political subdivision by the United States department of transportation that are subsequently paid to the department by such political subdivision.

(5) "Political subdivision" means any municipality, county, city and county, or other political subdivision of the state.

(6) "Qualified federal aid transportation project" means any project that may be financed, in whole or in part, with federal transportation funds.

(7) "Revenue anticipation notes" or "notes" means revenue anticipation notes authorized by and issued in accordance with this part 7.

(8) "State matching funds" means revenues other than federal transportation funds that are credited to the state highway fund or the state highway supplementary fund in accordance with section 43–1–220 and that may be used by the department to pay the costs of any qualified federal aid transportation projects.

**43–4–703. Powers of executive director.** The executive director is authorized to enter into contracts with the federal government, the state of Colorado, any state institution or agency, any political subdivision, any department, agency, or instrumentality of a political subdivision, and any political or public corporation of the state, and with any person necessary or incidental to the performance of the duties and the execution of the powers of the executive director under this part 7.

**43–4–704. Revenue anticipation notes.** (1) Subject to the provisions of this part 7, the executive director, on behalf of the department, from time to time, may issue revenue anticipation notes for the purpose of financing any qualified federal aid transportation projects.

(2) (a) SUBJECT TO THE PROVISIONS OF THIS SUBSECTION (2), THE PRINCIPAL OF AND INTEREST ON REVENUE ANTICIPATION NOTES AND ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES SHALL BE PAYABLE SOLELY FROM:

(I) FEDERAL TRANSPORTATION FUNDS AND STATE MATCHING FUNDS THAT ARE ALLOCATED ON AN ANNUAL BASIS FOR SUCH PURPOSE BY THE COMMISSION, IN ITS SOLE DISCRETION, IN ACCORDANCE WITH SECTION 43-1-113;

(II) ANY PROCEEDS OF SUCH NOTES AND ANY EARNINGS FROM THE INVESTMENT OF SUCH NOTE PROCEEDS PLEDGED FOR SUCH PURPOSE; AND

(III) ANY OTHER REVENUES, FUNDS, OR OTHER SECURITY PLEDGED FOR SUCH PURPOSE THAT DO NOT CONSTITUTE REVENUES OR FUNDS OF THE STATE.

(b) THE OWNERS OR HOLDERS OF THE REVENUE ANTICIPATION NOTES MAY NOT LOOK TO ANY OTHER REVENUES OF THE STATE FOR THE PAYMENT OF THE NOTES.

(c) (I) (A) THE PORTION OF THE PRINCIPAL OF AND INTEREST ON REVENUE ANTICIPATION NOTES AND THE COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES THAT MAY BE PAID FROM FEDERAL TRANSPORTATION FUNDS PURSUANT TO FEDERAL LAW AND ANY AGREEMENT BETWEEN THE UNITED STATES DEPARTMENT OF TRANSPORTATION AND THE DEPARTMENT OR THE POLITICAL SUBDIVISION THAT IS OR IS TO BE THE INITIAL RECIPIENT OF SUCH FEDERAL TRANSPORTATION FUNDS, HEREINAFTER REFERRED TO IN THIS SUBSECTION (2) AS "THE FEDERAL SHARE OF PRINCIPAL, INTEREST, AND COSTS", SHALL BE PAID FROM FEDERAL TRANSPORTATION FUNDS THAT THE COMMISSION, IN ITS SOLE DISCRETION, HAS ALLOCATED ON AN ANNUAL BASIS FOR THIS PURPOSE IN ACCORDANCE WITH SECTION 43-1-113.

(B) IF FEDERAL TRANSPORTATION FUNDS ARE NOT SUFFICIENT TO PAY THE FEDERAL SHARE OF PRINCIPAL, INTEREST, AND COSTS WHEN DUE, THE EXECUTIVE DIRECTOR SHALL REQUEST AND THE COMMISSION MAY GRANT SUCH REQUEST TO TEMPORARILY PAY THE FEDERAL SHARE OF PRINCIPAL, INTEREST, AND COSTS WITH STATE MATCHING FUNDS THAT THE COMMISSION, IN ITS SOLE DISCRETION, HAS ALLOCATED ON AN ANNUAL BASIS FOR THIS PURPOSE IN ACCORDANCE WITH SECTION 43-1-113.

(II) NOTWITHSTANDING THE PROVISIONS OF SECTION 443-1-220(2)(c) AND (2)(h), THE STATE HIGHWAY FUND, THE STATE HIGHWAY SUPPLEMENTARY FUND, OR BOTH, SHALL BE REIMBURSED FOR THE AMOUNT OF MONEYS IN SAID FUND OR FUNDS USED IN ACCORDANCE WITH SUBPARAGRAPH (I) OF THIS PARAGRAPH (c) FROM FEDERAL TRANSPORTATION FUNDS THAT THE COMMISSION DETERMINES ARE NOT NEEDED IN THE FUTURE TO PAY THE FEDERAL SHARE OF PRINCIPAL, INTEREST, AND COSTS.

(d) NO MONEYS CREDITED TO THE STATE HIGHWAY FUND THAT ARE REQUIRED TO BE EXPENDED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 18 OF ARTICLE X OF THE STATE CONSTITUTION SHALL BE ALLOCATED AND USED TO PAY REVENUE ANTICIPATION NOTES FINANCING ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT THAT IS NOT A STATE HIGHWAY PROJECT OR TO PAY ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES.

(3) (a) THE EXECUTIVE DIRECTOR SHALL ISSUE REVENUE ANTICIPATION NOTES PURSUANT TO A CERTIFICATE EXECUTED BY THE EXECUTIVE DIRECTOR, A TRUST INDENTURE BETWEEN THE EXECUTIVE DIRECTOR AND ANY COMMERCIAL BANK OR TRUST COMPANY HAVING FULL TRUST POWERS, OR ANY OTHER INSTRUMENT ISSUED BY THE EXECUTIVE DIRECTOR.

(b) AS THE EXECUTIVE DIRECTOR DEEMS APPROPRIATE, THE CERTIFICATE, TRUST INDENTURE, OR OTHER INSTRUMENT AUTHORIZING REVENUE ANTICIPATION NOTES MAY CONTAIN SUCH PROVISIONS SETTING FORTH THE RIGHTS AND REMEDIES OF THE OWNERS OR HOLDERS OF THE REVENUE ANTICIPATION NOTES, MAY CONTAIN SUCH PROVISIONS FOR PROTECTING AND ENFORCING THE RIGHTS AND REMEDIES OF THE OWNERS OR HOLDERS OF THE REVENUE ANTICIPATION NOTES AS THE EXECUTIVE DIRECTOR DEEMS APPROPRIATE, AND MAY CONTAIN SUCH OTHER PROVISIONS THAT THE EXECUTIVE DIRECTOR DEEMS APPROPRIATE FOR THE SECURITY OF THE OWNERS OR HOLDERS OF THE REVENUE ANTICIPATION NOTES. SUCH PROVISIONS MAY INCLUDE, BUT SHALL NOT BE LIMITED TO, PROVISIONS REGARDING LETTERS OF CREDIT, INSURANCE, STAND-BY CREDIT AGREEMENTS, OR OTHER FORMS OF CREDIT ENSURING TIMELY PAYMENT OF THE REVENUE ANTICIPATION NOTES, INCLUDING THE REDEMPTION PRICE OR THE PURCHASE PRICE, AND PROVISIONS REGARDING THE REIMBURSEMENT OF PROVIDERS OF

SUCH CREDIT OUT OF REVENUES AVAILABLE FOR THE PAYMENT OF PRINCIPAL OF AND INTEREST ON THE REVENUE ANTICIPATION NOTES FOR ANY AMOUNTS PAID BY SUCH PROVIDERS WITH RESPECT TO SUCH NOTES.

(4) (a) SUBJECT TO THE PROVISIONS OF PARAGRAPH (b) OF THIS SUBSECTION (4), REVENUE ANTICIPATION NOTES MAY BE ISSUED IN SUCH AGGREGATE PRINCIPAL AMOUNT, MAY BE ISSUED IN ONE OR MORE SERIES, MAY BEAR SUCH DATES, MAY BE IN SUCH DENOMINATION OR DENOMINATIONS, MAY MATURE ON ANY DATE OR DATES, MAY MATURE IN SUCH AMOUNT OR AMOUNTS, MAY BE IN SUCH FORM, MAY BE PAYABLE AT SUCH PLACE OR PLACES, MAY BE SUBJECT TO SUCH TERMS OF REDEMPTION WITH OR WITHOUT A PREMIUM, MAY CONTAIN SUCH PROVISIONS AS THE EXECUTIVE DIRECTOR DEEMS APPROPRIATE REGARDING INSURANCE TO ENSURE THE TIMELY PAYMENT OF THE NOTES, AND MAY CONTAIN SUCH OTHER PROVISIONS NOT INCONSISTENT WITH THE PROVISIONS OF THIS PART 7 AS THE EXECUTIVE DIRECTOR MAY DETERMINE.

(b) THE AGGREGATE AMOUNT OF ANNUAL INSTALLMENTS OF PRINCIPAL AND INTEREST ON ALL REVENUE ANTICIPATION NOTES ISSUED PURSUANT TO THIS PART 7 THAT ARE SCHEDULED TO BE PAID DURING ANY GIVEN FISCAL YEAR, DETERMINED AS OF THE DATE OF ISSUANCE OF EACH SERIES OF NOTES, SHALL NOT EXCEED AN AMOUNT EQUAL TO FIFTY PERCENT OF THE AGGREGATE AMOUNT OF FEDERAL TRANSPORTATION FUNDS PAID TO THE DEPARTMENT DURING THE FISCAL YEAR IMMEDIATELY PRECEDING THE FISCAL YEAR IN WHICH SUCH SERIES OF NOTES IS ISSUED.

(5) THE RATE OR RATES OF INTEREST BORNE BY THE REVENUE ANTICIPATION NOTES MAY BE FIXED, ADJUSTABLE, OR VARIABLE OR ANY COMBINATION THEREOF WITHOUT REGARD TO ANY INTEREST RATE LIMITATION APPEARING IN ANY OTHER LAW OF THIS STATE. IF ANY RATE OR RATES ARE ADJUSTABLE OR VARIABLE, THE STANDARD, INDEX, METHOD, OR FORMULA SHALL BE DETERMINED BY THE EXECUTIVE DIRECTOR.

(6) REVENUE ANTICIPATION NOTES MAY BE SOLD AT PUBLIC OR PRIVATE SALE AND MAY BE SOLD AT, ABOVE, OR BELOW THE PRINCIPAL AMOUNTS THEREOF. THE SALE OF SUCH NOTES SHALL NOT BE SUBJECT TO THE "PROCUREMENT CODE", ARTICLES 101 TO 112 OF TITLE 24, C.R.S.

(7) REVENUE ANTICIPATION NOTES SHALL BE SIGNED ON BEHALF OF THE DEPARTMENT BY THE EXECUTIVE DIRECTOR AND THE CHIEF ENGINEER OF THE DEPARTMENT. PURSUANT TO ARTICLE 55 OF TITLE 11, C.R.S., THE SIGNATURES OF THE EXECUTIVE DIRECTOR AND THE CHIEF ENGINEER OF THE DEPARTMENT MAY BE FACSIMILE SIGNATURES IMPRINTED, ENGRAVED, STAMPED, OR OTHERWISE PLACED ON THE REVENUE ANTICIPATION NOTES. IF ALL OF THE SIGNATURES ON THE REVENUE ANTICIPATION NOTES ARE FACSIMILE SIGNATURES, PROVISION SHALL BE MADE FOR A MANUAL AUTHENTICATING SIGNATURE ON THE REVENUE ANTICIPATION NOTES BY OR ON BEHALF OF A DESIGNATED AUTHENTICATING AGENT.

(8) THE POWER TO FIX THE DATE OF SALE OF THE REVENUE ANTICIPATION NOTES, TO RECEIVE BIDS OR PROPOSALS, TO AWARD AND SELL REVENUE ANTICIPATION NOTES, TO FIX INTEREST RATES, AND TO TAKE ALL OTHER ACTION NECESSARY TO SELL AND DELIVER THE NOTES MAY BE DELEGATED TO AN AGENT OF THE EXECUTIVE DIRECTOR.

(9) ANY OUTSTANDING REVENUE ANTICIPATION NOTES MAY BE REFUNDED BY THE EXECUTIVE DIRECTOR PURSUANT TO ARTICLE 56 OF TITLE 11, C.R.S. ALL REVENUE ANTICIPATION NOTES ARE DECLARED TO BE NEGOTIABLE INSTRUMENTS.

(10) THE EXECUTIVE DIRECTOR IS AUTHORIZED TO ENGAGE THE SERVICES OF SUCH CONSULTANTS, FINANCIAL ADVISORS, UNDERWRITERS, BOND INSURERS, LETTER OF CREDIT BANKS, RATING AGENCIES, AGENTS, OR OTHER PERSONS WHOSE SERVICES MAY BE REQUIRED OR DEEMED ADVANTAGEOUS BY THE EXECUTIVE DIRECTOR IN CONNECTION WITH SUCH REVENUE ANTICIPATION NOTES. THE EXECUTIVE DIRECTOR SHALL CONTRACT FOR SUCH SERVICES IN ACCORDANCE WITH THE "PROCUREMENT CODE", ARTICLES 101 TO 112 OF TITLE 24, C.R.S.; EXCEPT THAT CONTRACTING FOR SERVICES OF BOND INSURERS, LETTER OF CREDIT BANKS, AND RATING AGENCIES SHALL NOT BE SUBJECT TO THE "PROCUREMENT CODE".

(11) THE EXECUTIVE DIRECTOR MAY, WITH RESPECT TO REVENUE ANTICIPATION NOTES THAT HAVE BEEN ISSUED OR PROPOSED REVENUE ANTICIPATION NOTES, ENTER INTO INTEREST RATE EXCHANGE AGREEMENTS IN ACCORDANCE WITH ARTICLE 59.3 OF TITLE 11, C.R.S.

(12) (a) THE PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES THAT ARE NOT OTHERWISE PLEDGED FOR THE PAYMENT OF

SUCH NOTES, STATE MATCHING FUNDS, OR FEDERAL TRANSPORTATION FUNDS, ANY OF WHICH HAVE BEEN ALLOCATED ON AN ANNUAL BASIS BY THE COMMISSION, IN ITS SOLE DISCRETION, IN ACCORDANCE WITH SECTION 43–1–113 FOR THE PAYMENT OF REVENUE ANTICIPATION NOTES OR ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES, ARE PLEDGED AND SHALL BE USED ONLY FOR THE PURPOSE OR PURPOSES FOR WHICH SUCH REVENUES ARE ALLOCATED. THE PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES THAT ARE PLEDGED PURSUANT TO SECTION 43–4–706(1) SHALL BE USED ONLY FOR THE PURPOSE OR PURPOSES FOR WHICH SUCH REVENUES ARE PLEDGED. ANY SUCH PLEDGE SHALL BE VALID AND BINDING FROM THE TIME THE COMMISSION MAKES THE ALLOCATION; EXCEPT THAT ANY PLEDGE OF REVENUE ANTICIPATION NOTE PROCEEDS PURSUANT TO SECTION 43–4–706(1) SHALL BE VALID AND BINDING FROM THE DATE OF ISSUANCE OF SUCH NOTES. THE PLEDGE SHALL CREATE A VALID SECURITY INTEREST, AND SUCH REVENUES SHALL IMMEDIATELY BE SUBJECT TO THE LIEN OF THE PLEDGE AND SECURITY INTEREST WITHOUT ANY PHYSICAL DELIVERY OR FURTHER ACT, AND THE LIEN OF THE PLEDGE AND SECURITY INTEREST SHALL BE VALID AND BINDING AGAINST ALL PARTIES HAVING CLAIMS OF ANY KIND IN TORT, CONTRACT, OR OTHERWISE AGAINST THE PLEDGING PARTY IRRESPECTIVE OF WHETHER SUCH CLAIMING PARTY HAS NOTICE OF SUCH LIEN. THE INSTRUMENT BY WHICH THE PLEDGE AND SECURITY INTEREST IS CREATED NEED NOT BE RECORDED OR FILED IN ORDER TO PERFECT SUCH PLEDGE AND SECURITY INTEREST.

(b) NOTWITHSTANDING ANY OTHER PROVISION OF LAW TO THE CONTRARY, INCLUDING BUT NOT LIMITED TO SECTION 24–91–103.6, C.R.S., THE LIEN OF THE PLEDGE AND SECURITY INTEREST ON ANY REVENUE ANTICIPATION NOTE PROCEEDS SHALL NOT AFFECT THE AUTHORITY OF THE DEPARTMENT TO ENTER INTO CONTRACTS FOR THE DESIGN AND CONSTRUCTION OF ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT.

**43–4–705. Financial obligations subject to annual budget allocation.** (1) ANY REVENUE ANTICIPATION NOTES ISSUED IN ACCORDANCE WITH THIS PART 7 SHALL CONSTITUTE A CONTRACT BETWEEN THE DEPARTMENT AND THE OWNER OR HOLDER THEREOF. IN NO EVENT SHALL ANY DECISION BY THE COMMISSION NOT TO ALLOCATE REVENUE ANTICIPATION NOTE PROCEEDS NOT OTHERWISE PLEDGED, STATE MATCHING FUNDS, OR FEDERAL TRANSPORTATION FUNDS IN ANY GIVEN FISCAL YEAR FOR THE PAYMENT OF SUCH NOTES OR ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES BE CONSTRUED TO CONSTITUTE AN ACTION IMPAIRING SUCH CONTRACT.

(2) (a) EVERY CONTRACT ENTERED INTO BY THE EXECUTIVE DIRECTOR PURSUANT TO THE PROVISIONS OF THIS PART 7 SHALL PROVIDE THAT ALL FINANCIAL OBLIGATIONS OF THE STATE UNDER SUCH CONTRACTS ARE SUBJECT TO ALLOCATION ON AN ANNUAL BASIS BY THE COMMISSION, IN ITS SOLE DISCRETION, IN ACCORDANCE WITH SECTION 43–1–113 _____ AND THAT SUCH CONTRACTS SHALL NOT BE DEEMED OR CONSTRUED AS:

(I) CREATING AN INDEBTEDNESS OF THE STATE WITHIN THE MEANING OF THE STATE CONSTITUTION OR THE LAWS OF THE STATE OF COLORADO CONCERNING OR LIMITING THE CREATION OF INDEBTEDNESS BY THE STATE OF COLORADO; AND

(II) CREATING ANY MULTIPLE–FISCAL YEAR DIRECT OR INDIRECT FINANCIAL OBLIGATION OF THE STATE OF COLORADO WITHIN THE MEANING OF SECTION 20 OF ARTICLE X OF THE STATE CONSTITUTION.

(b) IN ADDITION, REVENUE ANTICIPATION NOTES ISSUED BY THE EXECUTIVE DIRECTOR PURSUANT TO THE PROVISIONS OF THIS PART 7 AND EVERY CONTRACT RELATING TO THE ISSUANCE OF SUCH NOTES SHALL PROVIDE THAT ALL FINANCIAL OBLIGATIONS OF THE STATE IN REGARD TO THE PORTION OF THE PRINCIPAL OF AND INTEREST ON SUCH NOTES AND THE COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES THAT MAY BE PAID FROM FEDERAL TRANSPORTATION FUNDS PURSUANT TO FEDERAL LAW AND ANY AGREEMENT BETWEEN THE UNITED STATES DEPARTMENT OF TRANSPORTATION AND THE DEPARTMENT OR THE POLITICAL SUBDIVISION THAT IS OR IS TO BE THE INITIAL RECIPIENT OF SUCH FEDERAL TRANSPORTATION FUNDS ARE SUBJECT TO CONTINUING FEDERAL APPROPRIATIONS OF FEDERAL TRANSPORTATION FUNDS AT A LEVEL EQUAL TO OR GREATER THAN THE AMOUNT NEEDED TO PAY THE FEDERAL SHARE OF

PRINCIPAL, INTEREST, AND COSTS ON THE REVENUE ANTICIPATION NOTES.

(3) THE EXECUTIVE DIRECTOR MAY PAY ALL FEES, EXPENSES, AND COMMISSIONS THAT THE EXECUTIVE DIRECTOR DEEMS NECESSARY OR ADVANTAGEOUS IN CONNECTION WITH THE SALE OF NOTES.

(4) NEITHER THE MEMBERS OF THE COMMISSION, THE EXECUTIVE DIRECTOR, NOR ANY PERSON EXECUTING REVENUE ANTICIPATION NOTES IN ACCORDANCE WITH THE PROVISIONS OF THIS PART 7 SHALL BE LIABLE PERSONALLY ON THE NOTES OR BE SUBJECT TO ANY PERSONAL LIABILITY OR ACCOUNTABILITY BY REASON OF THE ISSUANCE THEREOF.

**43–4–706. Note proceeds.** (1) THE CERTIFICATE, TRUST INDENTURE, OR OTHER INSTRUMENT AUTHORIZING THE ISSUANCE OF REVENUE ANTICIPATION NOTES IN ACCORDANCE WITH THE PROVISIONS OF THIS PART 7 MAY PLEDGE ALL OR ANY PORTION OF THE PROCEEDS FROM THE ISSUANCE OF SUCH NOTES TO THE PAYMENT OF SUCH NOTES AND ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES.

(2) ANY PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES IN ACCORDANCE WITH THE PROVISIONS OF THIS PART 7 THAT ARE NOT PLEDGED FOR THE PAYMENT OF SUCH NOTES AND ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES SHALL BE CREDITED TO THE STATE HIGHWAY SUPPLEMENTARY FUND AND SHALL BE USED TO FINANCE QUALIFIED FEDERAL AID TRANSPORTATION PROJECTS, TO PAY SUCH NOTES, TO PAY THE COSTS OF ISSUING AND ADMINISTERING SUCH REVENUE ANTICIPATION NOTES, AND TO PAY ANY OTHER EXPENSE OR CHARGE INCURRED IN CONNECTION WITH ACTIONS OF THE EXECUTIVE DIRECTOR AUTHORIZED BY THE PROVISIONS OF THIS PART 7.

(3) ANY PROCEEDS FROM THE ISSUANCE OF SUCH NOTES SHALL NOT BE INCLUDED IN STATE FISCAL YEAR SPENDING, AS DEFINED BY SECTION 24–77–102(17)(a), C.R.S., FOR ANY GIVEN FISCAL YEAR FOR PURPOSES OF SECTION 20 OF ARTICLE X OF THE STATE CONSTITUTION AND ARTICLE 77 OF TITLE 24, C.R.S.

**43–4–707. Investments.** (1) ANY PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES OR ANY OTHER MONEYS RELATING TO SUCH NOTES THAT ARE CREDITED TO THE STATE HIGHWAY SUPPLEMENTARY FUND SHALL BE INVESTED IN THE SAME MANNER AS ALL OTHER MONEYS CREDITED TO SAID FUND AS PROVIDED BY LAW.

(2) THE EXECUTIVE DIRECTOR, IN CONSULTATION WITH THE STATE TREASURER, MAY DIRECT A CORPORATE TRUSTEE THAT HOLDS ANY PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES OR ANY OTHER MONEYS PAID TO SUCH TRUSTEE IN CONNECTION WITH SUCH NOTES TO INVEST OR DEPOSIT SUCH MONEYS IN INVESTMENTS OR DEPOSITS OTHER THAN THOSE IN WHICH MONEYS IN THE STATE HIGHWAY SUPPLEMENTARY FUND MAY BE INVESTED OR DEPOSITED IF THE EXECUTIVE DIRECTOR, IN CONSULTATION WITH THE STATE TREASURER, DETERMINES THAT SUCH INVESTMENT OR DEPOSIT MEETS THE STANDARD ESTABLISHED IN SECTION 15–1–304, C.R.S., THE INCOME IS AT LEAST COMPARABLE TO INCOME AVAILABLE ON INVESTMENTS OR DEPOSITS OF MONEYS IN THE STATE HIGHWAY SUPPLEMENTARY FUND, AND THE INVESTMENT WILL ASSIST THE DEPARTMENT IN THE FINANCING, CONSTRUCTION, OPERATION, OR MAINTENANCE OF QUALIFIED FEDERAL AID TRANSPORTATION PROJECTS.

**43–4–708. Powers of political subdivisions.** (1) A POLITICAL SUBDIVISION, FOR THE PURPOSE OF AIDING AND COOPERATING IN THE FINANCING, CONSTRUCTION, OPERATION, OR MAINTENANCE OF ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT, HAS THE POWER:

(a) TO SELL, LEASE, LOAN, DONATE, GRANT, CONVEY, ASSIGN, OR OTHERWISE TRANSFER TO THE DEPARTMENT ANY REAL OR PERSONAL PROPERTY OR INTERESTS THEREIN;

(b) TO ENTER INTO AGREEMENTS WITH ANY PERSON FOR THE JOINT FINANCING, CONSTRUCTION, OPERATION, OR MAINTENANCE OF ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT. UPON COMPLIANCE WITH APPLICABLE CONSTITUTIONAL OR CHARTER LIMITATIONS, THE POLITICAL SUBDIVISION MAY AGREE TO MAKE PAYMENTS, WITHOUT LIMITATION AS TO AMOUNT EXCEPT AS SET FORTH IN THE AGREEMENT, FROM REVENUES RECEIVED IN ONE OR MORE FISCAL YEARS TO THE DEPARTMENT OR ANY PERSON TO DEFRAY THE COSTS OF THE FINANCING, CONSTRUCTION, OPERATION, OR MAINTENANCE OF ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT.

(c) TO TRANSFER OR ASSIGN TO THE DEPARTMENT ANY CONTRACTS THAT MAY HAVE BEEN AWARDED BY THE POLITICAL SUBDIVISION FOR CONSTRUCTION, OPERATION, OR MAINTENANCE OF ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT.

(2) TO ASSIST IN THE FINANCING, CONSTRUCTION, OPERATION, OR MAINTENANCE OF A QUALIFIED FEDERAL AID TRANSPORTATION PROJECT, ANY POLITICAL SUBDIVISION MAY, BY CONTRACT, PLEDGE TO THE DEPARTMENT ALL OR A PORTION OF FEDERAL TRANSPORTATION FUNDS PAID TO THE POLITICAL SUBDIVISION, THE REVENUES THE POLITICAL SUBDIVISION RECEIVES FROM THE HIGHWAY USERS TAX FUND, OR THE REVENUES FROM ANY OTHER LEGALLY AVAILABLE SOURCE.

**43–4–709. Notes legal investments.** ALL BANKS, TRUST COMPANIES, SAVINGS AND LOAN ASSOCIATIONS, INSURANCE COMPANIES, EXECUTORS, ADMINISTRATORS, GUARDIANS, TRUSTEES, AND OTHER FIDUCIARIES MAY LEGALLY INVEST ANY MONEYS WITHIN THEIR CONTROL IN ANY REVENUE ANTICIPATION NOTES ISSUED IN ACCORDANCE WITH THIS PART 7. PUBLIC ENTITIES, AS DEFINED IN SECTION 24–75–601(1), C.R.S., MAY INVEST PUBLIC FUNDS IN SUCH REVENUE ANTICIPATION NOTES ONLY IF THE NOTES SATISFY THE INVESTMENT REQUIREMENTS ESTABLISHED IN PART 6 OF ARTICLE 75 OF TITLE 24, C.R.S.

**43–4–710. Exemption from taxation.** EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, THE INCOME FROM REVENUE ANTICIPATION NOTES IS EXEMPT FROM ALL TAXATION AND ASSESSMENTS IN THE STATE. IN THE CERTIFICATE, INDENTURE OF TRUST, OR OTHER INSTRUMENT AUTHORIZING THE ISSUANCE OF SUCH NOTES, THE EXECUTIVE DIRECTOR MAY WAIVE THE EXEMPTION FROM FEDERAL OR STATE INCOME TAXATION FOR INTEREST ON THE NOTES.

**43–4–711. No action maintainable.** AN ACTION OR PROCEEDING AT LAW OR IN EQUITY TO REVIEW ANY ACTS OR PROCEEDINGS OR TO QUESTION THE VALIDITY OR ENJOIN THE PERFORMANCE OF ANY ACT OR PROCEEDINGS OR THE ISSUANCE OF ANY REVENUE ANTICIPATION NOTES OR FOR ANY OTHER RELIEF AGAINST OR FROM ANY ACTS OR PROCEEDINGS DONE UNDER THIS PART 7, WHETHER BASED UPON IRREGULARITIES OR JURISDICTIONAL DEFECTS, SHALL NOT BE MAINTAINED UNLESS COMMENCED WITH THIRTY DAYS AFTER THE PERFORMANCE OF THE ACT OR PROCEEDINGS OR THE EFFECTIVE DATE THEREOF, WHICHEVER OCCURS FIRST, AND IS THEREAFTER PERPETUALLY BARRED.

**43–4–712. Annual reports.** (1) NO LATER THAN JANUARY 15 OF EACH YEAR, THE EXECUTIVE DIRECTOR SHALL SUBMIT A REPORT TO THE MEMBERS OF THE JOINT BUDGET COMMITTEE OF THE GENERAL ASSEMBLY, THE MEMBERS OF THE LEGISLATIVE AUDIT COMMITTEE OF THE GENERAL ASSEMBLY, THE CHAIR OF THE TRANSPORTATION AND ENERGY COMMITTEE OF THE HOUSE OF REPRESENTATIVES, AND THE CHAIR OF THE TRANSPORTATION COMMITTEE OF THE SENATE THAT INCLUDES, AT A MINIMUM, THE FOLLOWING INFORMATION:

(a) THE TOTAL AMOUNT OF REVENUE ANTICIPATION NOTES ISSUED BY THE EXECUTIVE DIRECTOR IN ACCORDANCE WITH THIS PART 7;

(b) THE QUALIFIED FEDERAL AID TRANSPORTATION PROJECTS FOR WHICH THE PROCEEDS FROM SUCH REVENUE ANTICIPATION NOTES HAVE BEEN EXPENDED, THE AMOUNT OF NOTE PROCEEDS EXPENDED ON EACH PROJECT, THE STATUS OF EACH PROJECT, AND THE ESTIMATED DATE OF COMPLETION FOR SUCH PROJECTS NOT YET COMPLETED;

(c) THE TOTAL AMOUNT OF FEDERAL TRANSPORTATION FUNDS PAID TO THE DEPARTMENT SINCE SUCH REVENUE ANTICIPATION NOTES HAVE BEEN ISSUED; AND

(d) THE TOTAL AMOUNT OF PROCEEDS FROM THE ISSUANCE OF REVENUE ANTICIPATION NOTES, STATE MATCHING FUNDS, AND FEDERAL, TRANSPORTATION FUNDS ALLOCATED BY THE COMMISSION IN EACH STATE FISCAL YEAR FOR THE PAYMENT OF SUCH REVENUE ANTICIPATION NOTES AND THE COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES.

**43–4–713. Construction of part.** THE POWERS CONFERRED BY THIS PART 7 SHALL BE IN ADDITION AND SUPPLEMENTAL TO, AND NOT IN SUBSTITUTION FOR, AND THE LIMITATIONS IMPOSED BY THIS PART 7 SHALL NOT DIRECTLY OR INDIRECTLY MODIFY, LIMIT, OR AFFECT, THE POWERS CONFERRED TO THE EXECUTIVE DIRECTOR, THE COMMISSION, OR THE DEPARTMENT BY ANY OTHER LAW.

**SECTION 2.** 43-1-105, Colorado Revised Statutes, is amended BY THE ADDITION OF A NEW SUBSECTION to read:

**43-1-105. Powers and duties of the executive director.** (5) THE EXECUTIVE DIRECTOR SHALL HAVE THE POWER TO ISSUE TRANSPORTATION REVENUE ANTICIPATION NOTES IN ACCORDANCE WITH THE PROVISIONS OF PART 7 OF ARTICLE 4 OF THIS TITLE.

**SECTION 3.** 43-1-113, Colorado Revised Statutes, is amended BY THE ADDITION OF A NEW SUBSECTION to read:

**43-1-113. Funds — budgets — fiscal year—reports and publications.** (19)(a) ANY PAYMENTS FOR TRANSPORTATION REVENUE ANTICIPATION NOTES ISSUED TO FINANCE ANY QUALIFIED FEDERAL AID TRANSPORTATION PROJECT AND ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES SHALL BE SUBJECT TO ANNUAL ALLOCATION BY THE COMMISSION, IN ITS SOLE DISCRETION, IN ACCORDANCE WITH PART 7 OF ARTICLE 4 OF THIS TITLE.

(b) FEDERAL TRANSPORTATION FUNDS, AS DEFINED IN SECTION 43-4-702(4), THAT ARE PAID TO THE STATE SHALL BE ALLOCATED AND USED TO REIMBURSE THE STATE HIGHWAY FUND, THE STATE HIGHWAY SUPPLEMENTARY FUND, OR BOTH, FOR ANY MONEYS IN SAID FUND OR FUNDS USED TO PAY TRANSPORTATION REVENUE ANTICIPATION NOTES OR ANY COSTS ASSOCIATED WITH THE ISSUANCE AND ADMINISTRATION OF SUCH NOTES IN ACCORDANCE WITH SECTION 434-704(2)(c)(II).

**SECTION 4.** 43-1-219, Colorado Revised Statutes, is amended to read:

**43-1-219. Funds created.** There are hereby created two separate funds, one to be known as the state highway fund and the other to be known as the state highway supplementary fund. All moneys paid into either of said funds shall be available immediately, without further appropriation, for the purposes of such fund as provided by law. Any sums paid into the state treasury, which by law belong to the state highway fund or to the state highway supplementary fund, shall be immediately placed by the state treasurer to the credit of the appropriate fund. Upon request of the commission or of the chief engineer, it is the duty of the state treasurer to report to the commission or to the chief engineer the amount of money on hand in each of said two funds and the amounts derived from each source from which each such fund is accumulated. All accounts and expenditures from each of said two funds shall be certified by the chief engineer and paid by the state treasurer upon warrants drawn by the controller. The controller is authorized as directed to draw warrants payable out of the specified fund upon such vouchers properly certified and audited. Nothing in this part 2 shall operate to alter the manner of the execution and issuance of highway anticipation warrants provided in part 3 of article 4 of this title OR TRANSPORTATION REVENUE ANTICIPATION NOTES PROVIDED IN PART 7 OF ARTICLE 4 OF THIS TITLE.

**SECTION 5.** 43-1-220 (2), Colorado Revised Statutes, is amended BY THE ADDITION OF THE FOLLOWING NEW PARAGRAPHS to read:

**43-1-220. Sources of funds—assumption of obligations.** (2) All receipts from the following sources shall be paid into and credited to the state highway supplementary fund as soon as received from:

(g) ANY PROCEEDS FROM THE ISSUANCE OF TRANSPORTATION REVENUE ANTICIPATION NOTES IN ACCORDANCE WITH PART 7 OF ARTICLE 4 OF THIS TITLE; AND

(h) ANY REVENUES RECEIVED FROM POLITICAL SUBDIVISIONS PURSUANT TO SECTION 43-4-708, INCLUDING BUT NOT LIMITED TO FEDERAL TRANSPORTATION FUNDS AS DEFINED IN SECTION 434-702(4);

**SECTION 6. Safety clause.** The general assembly hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, and safety.

## APPENDIX B

*Colorado Legislative Council Staff*

### STATE and LOCAL
### CONDITIONAL FISCAL IMPACT

**Drafting Number:** LLS 99–0735
**Prime Sponsor(s):** Rep. George
Sen. Powers

**Date:** February 24, 1999
**Bill Status:** House Transportation
**Fiscal Analyst:** Scott Nachtrieb (303–866–4752)

TITLE: CONCERNING TRANSPORTATION REVENUE ANTICIPATION NOTES.

| Fiscal Impact Summary | FY 1999/2000 | FY 2000/2001 |
|---|---|---|
| State Revenues Cash Fund | | |
| State Expenditures Cash Fund | | Possible interest on and cost of issuing TRANs |
| FTE Position Change | 0.0. FTE | 0.0. FTE |
| Other State Impact: None | | |
| Effective Date: Upon the Governor's signature | | |
| Appropriation Summary for FY 1999–2000: None | | |
| Local Government Impact: Impact of Intergovernmental agreements | | |

---

### Background Information

Section 311 of the National Highway System Designation Act of 1995 changed how states may use federal transportation aid for issuing bonds. Prior to 1995, federal transportation aid could only be used to pay the principal of a bond issue but riot the interest or other related financing costs. The 1995 change allowed federal transportation aid to be used for payment of the principal, interest, financing, insurance, and other related bond issue costs. The change also required that projects built utilizing this new funding method would have to be eligible for normal federal aid funding, preapproved by the federal government as an advanced construction project, and the amount approved would be equal to the federal share of the project (generally 80 percent federal share). It should also be noted that the Transportation Equity Act for the 21st Century (TEA–21) has a minimum guarantee that states will receive no less than 90.5 percent of their contribution to the Federal Highway Trust Fund. This attempts to minimize the risk of reduced federal funding for the six-year authorization period provided by TEA–21.

### Summary of Legislation

This bill would allow the Colorado Department of Transportation (CDOT) to issue transportation revenue anticipation notes ("TRANs") to finance qualified federal aid transportation projects. The notes, financing, and administrative costs related to issuing the notes would be paid from: federal funds; state highway funds; note proceeds; or funds from political subdivisions that can be used to finance transportation projects; and certain other non-state revenues (insurance, letters of credit, and stand-by credit agreements). Should federal funds not be sufficient to pay principal, interest, and associated costs, state matching funds would be used and would be reimbursed by the federal

transportation funds when received. Note proceeds may be pledged for the payment of notes or credited to the State Highway Supplementary Fund. Constitutionally earmarked state funds for highways would be used only to pay for the portion of notes issued for qualified federal aid transportation projects that are highway projects. However, a portion of the sales and use tax diversion could be used to finance other transportation projects.

The aggregate amount of the annual installment payments for principal and interest on TRANs during any given fiscal year would be limited to fifty percent of the federal transportation funds received in the previous fiscal year. CDOT would be able to refund TRANs, to engage services required to issue TRANs, and to enter into interest rate exchange agreements for TRANs.

Payment of the notes and the related costs would be subject to annual allocation by the Transportation Commission. The owners or holders of TRANs would not be able to receive payment from any other state revenue source for the payment of the notes. Proceeds from TRANs would not be included in state fiscal year spending. State political subdivisions would be given the ability to assist in the financing, construction, operation, and maintenance of qualified federal aid transportation projects. CDOT would be required to report annually to the General Assembly.

### State Revenues

State HUTF revenues and federal transportation funds received by Colorado would not change as a result of this bill. The bill is permissive and should the Transportation Commission choose to utilize TRANs, designate state funds for this purpose, apply for federal discretionary funds, and enter into agreements with the Regional Transportation District (RTD) and other local government, there would be a fiscal impact. However, this bill would not result in increased revenues from state taxes, fees, or penalties, nor would the state receive additional federal moneys that are not authorized and appropriated.

Additional money would be generated from proceeds of the sale of the TRANs should CDOT choose to sell TRANs. It is assumed that CDOT would not be able to issue the TRANs until FY 2000–01. The bill allows CDOT several options on how to handle the proceeds. CDOT could contract with a third party to hold the note proceeds in trust and the third party would pay the costs of projects from the proceeds. The state could also deposit the proceeds into the State Highway Fund or State Highway Supplementary Fund and pay the costs of projects from the proceeds. The bill states that the notes would be contingent upon the Transportation Commission's annual appropriation and would not constitute a debt or multi-year debt and would not be subject to state fiscal year spending limits.

The provisions that would allow CDOT to enter into intergovernmental agreements with cities, counties, and other political subdivisions of the state to help finance the costs of construction projects are assessed as having no revenue impact. The number and nature of any agreement are not known. It is assumed that the intergovernmental agreements would involve existing revenues and property that would be used to help finance a project. No additional revenues are anticipated to flow to the state as a result of this provision.

### State Expenditures

Should CDOT choose to sell TRANs, CDOT would have additional costs of issuing the notes and the interest charged for the use of the proceeds. The costs of issuing the notes, insurance, and the interest charged is not known. However, the bill would limit the annual payment for principal and interest that can be made to half of the previous year's total federal transportation funds received.

*The following information is provided for illustrative purposes only.* Should CDOT issue notes to generate $1.0 billion for construction over a 15-year period, CDOT would have to issue approximately $1,114,-460,000 in notes. A reserve fund would require approximately $101,924,547. The costs of issuance, underwriter's fee, and bond in-

surance would be approximately § 12,535,-453. The following scenario assumes a level gross debt service with level monthly draws on the construction fund. The annual payment required to pay the principal and interest is estimated to be between § 97 and $102 million annually depending on whether interest earnings on the reserve fund (approximately $2.3 million annually) would be used to help pay off the notes. This would assume a Aa equivalent rating on the notes with interest charges ranging from 3.2 percent to 4.8 percent. The average interest charge would be estimated at 4.6 percent. The total interest paid over the 15 year period would be approximately $438,109,597.

Under this scenario, CDOT may contract with a third party to handle the proceeds from the sale of the bonds or put the proceeds in the State Highway Supplementary Fund. Should CDOT choose the third party, there would be an additional cost of managing the proceeds. The minimum estimated cost of managing the proceeds is a one-time cost of approximately § 110,000. The

amount of interest earned on the proceeds would be governed by the federal rules of arbitrage. Any excess arbitrage earnings would be returned to the federal government. However, if CDOT spends the proceeds faster than the arbitrage time constraints, the State Treasury may be able to generate more interest earnings at 6.0 percent than the private sector may generate at approximately 4.5 percent.

The table on the following page provides a ten-year picture of the highway funds that would have been available for annual payments since FY 1994–95 if this bill had been in effect at that time. The table contains:

· actual figures FY 1994–95 to 1997–98 and estimates from FY 1998–99 to 2004–05;

· federal appropriations to Colorado for highways under ISTEA and TEA–21;

· formula allocations from FY 1998–99 to 2004–05 increased at 12.2 % annually;

· discretionary funds that are not guaranteed under TEA–21; and

· discretionary estimates from FY 1998–99 to 2004–05 increased at 1.2 % annually.

**Highway Funds Available for Annual Payments had HB 99–1325 been in effect in FY 1994–95**
**($ in millions)**

| Fiscal Year | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–00 | 2000–01 | 2001–02 | 2002–03 | 2003–04 | 2004–05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Formula Allocation | $187.6 | $203.9 | $198.0 | $236.1 | $271.6 | $304.8 | $341.9 | $383.7 | $430.5 | $483.0 | $541.9 |
| Discretionary Funds | 23.8 | 23.3 | 10.8 | 32.0 | 41.8 | 42.3 | 42.8 | 43.3 | 43.8 | 44.3 | 44.9 |
| TOTAL | 211.4 | 227.2 | 208.8 | 268.1 | 313.4 | 347.2 | 384.7 | 427.0 | 474.3 | 527.3 | 586.8 |
| Available for Payment | $105.7 | $113.6 | $104.4 | $134.0 | $156.7 | $173.6 | $192.6 | $213.8 | $237.6 | $264.3 | $294.2 |

This table does not include an estimate of the possible transit funds and discretionary transit funds that may be available through an intergovernmental agreement with RTD. The transit funds that may be available are in addition to the highway funds CDOT may provide. The table below provides an indication of the amount of transit funds that may be available for payments should RTD and CDOT sign an intergovernmental agreement. The table contains:

· actual figures from FY 1994–95 to 1998–99 and estimates for FY 1999–00 to 2004–05;

· federal appropriations to RTD for transit under ISTEA and TEA–21;

· formula allocations for FY 2003–04 to 2004–05 increased at 7.0 % annually;

· fixed guideway funds that are not guaranteed under TEA–21; and

· fixed guideway estimates for FY 2003–04 to 2004–05 increased at 18.3 % annually.

**Transit Funds Available for Annual Payments had HB 99–1325 been in effect in FY 1994–95**
**($ in millions)**

| Fiscal Year | 1994–95 | 1995–96 | 1996–97 | 1997–98 | 1998–99 | 1999–00 | 2000–01 | 2001–02 | 2002–03 | 2003–04 | 2004–05 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Urban Formula | $19.2 | $15.9 | $18.0 | $22.1 | $25.0 | $28.5 | $28.7 | $30.8 | $33.0 | $35.3 | $37.8 |
| Fixed Guideway | 0.4 | 0.4 | 0.8 | 0.9 | 1.1 | 1.3 | 1.6 | 2.4 | 3.0 | 3.5 | 4.2 |
| TOTAL | $19.6 | $16.3 | $18.8 | $23.0 | $26.1 | $29.8 | $30.3 | $33.2 | $36.0 | $38.9 | $42.0 |
| Available for Payment | $9.8 | $8.2 | $9.4 | $11.5 | $13.0 | $14.9 | $15.2 | $16.6 | $18.0 | $19.4 | $21.0 |

## Local Government Impact

The intergovernmental agreements which CDOT may reach with local governments are not known at this time. It is assumed that the agreements would use existing resources and revenues to fund projects under this bill and that there would be no fiscal impact to local governments. This bill would allow local governments to use existing resources for purposes other than what current law allows. This bill is assessed as having no fiscal impact to local government revenues or expenditures. It does allow local governments to use existing resources for different purposes.

## State Appropriations

This fiscal note implies that no appropriation is required to implement this bill in FY 1999–00.

## Departments Contacted

Transportation   Revenue   State   Treasure OSPBRTD